AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
08/04/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
August 4, 2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ___MR___ DEPUTY

United States of America

v.

SERGE AGOPIAN,

Defendant(s)

Case No. 2:20-mj-03655

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 6, 2020, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 875(c) | Threats by Interstate Communications |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
Complainant's signature

Robert C. McElroy, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 8/4/2020

Judge's signature

City and state: Los Angeles, California

Hon. Pedro V. Castillo, U.S. Magistrate Judge
Printed name and title

**AFFIDAVIT**

I, Robert C. McElroy, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against and arrest warrant for, SERGE AGOPIAN ("AGOPIAN") for a violation of Title 18, United States Code, Section 875(c) (Threats by Interstate Communications). This affidavit is also made in support of search warrants for the following locations:

   a. The premises located at 120 East C Street, Unit A, Port Hueneme, CA 93041 (the "SUBJECT PREMISES"), as described more fully in Attachment A-1;

   b. A 1998 Ford Taurus station wagon bearing California license plate 4EYW207 ("SUBJECT VEHICLE 1"), as described more fully in Attachment A-2;

   c. A 2018 Honda CR-V bearing California license plate 8FHV040 ("SUBJECT VEHICLE 2"), as described more fully in Attachment A-3;

2. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 875(c) (Threats by Interstate Communications), 876 (Mailing Threatening Communications), 1461 (Mailing Obscene, Lewd, Lascivious, Indecent, Filthy, or Vile Matter), and 2261A(2) (Stalking) (the "Subject Offenses"), as described more fully in Attachment B.

Attachments A-1, A-2, A-3, and B, are incorporated herein by reference.

3.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.  I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and have been so employed since October 2019.  As a Special Agent I completed the FBI Academy in Quantico, Virginia, and received training to include the fundamentals of law, ethics, interviewing, report writing, firearms, surveillance, defensive tactics, and case management.  From March 2020 to the present, I have been assigned to the Violent Crimes Squad investigating threats to individuals and fugitive investigations in the Los Angeles Division of the FBI.

5.  Over the past four months, I have been assigned 24 threat investigations concerning civilians as well as United States Government employees.  Some of these investigations have resulted in arrests for which I was the affiant for the arrest warrants and search warrants.  I have also testified before

Grand Jury and secured indictments against those who have made similar threats to others.

### III. SUMMARY OF PROBABLE CAUSE

6. As set forth in greater detail below, beginning in the early 1990s, SERGE AGOPIAN ("AGOPIAN"), who was then in his early 20s, became infatuated with VICTIM 1, a college student at the time, and began a 30-year pattern of stalking and harassing VICTIM 1 and her family. In or around the Fall of 1991, VICTIM 1 obtained a restraining order (the "Restraining Order") against AGOPIAN. In or around April 1992, AGOPIAN was arrested for violating the Restraining Order when he physically attacked VICTIM 1 in her college bookstore.

7. In April 2020, VICTIM 3, VICTIM 1's college-aged daughter, received an email to her college email account from an anonymous email account. Around the same time, VICTIM 3 received two unsigned typed letters sent via U.S. Mail to VICTIM 3's home address and to the work address of VICTIM 2 (VICTIM 3's father). The email and letters contained the identical message, which detailed the locations where the author claimed to have recently seen VICTIM 3 play sports, and included a threat to rape and kill VICTIM 3.

8. One of the letters mailed to VICTIM 3 contained a fingerprint that matched AGOPIAN's fingerprint.

### IV. STATEMENT OF PROBABLE CAUSE

9. In or around April 8, 2020, FBI began investigating threats received by a victim via email and U.S. Mail. Based on my review of law enforcement reports, conversations with other

law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. AGOPIAN's Harassing Conduct Began in the 1990s

10. On July 22, 2020, the FBI interviewed VICTIM 1, who relayed the history of AGOPIAN's harassment and threatening conduct towards VICTIM 1 and her family.

11. According to VICTIM 1, VICTIM 1 attended University of California Santa Barbara ("UCSB") from 1989 to 1993. In her second year, VICTIM 1 was contacted by AGOPIAN by phone "out of the blue" and without inviting AGOPIAN to call her and without giving AGOPIAN her phone number. AGOPIAN told VICTIM 1 he saw her at a party and said she was very pretty. VICTIM 1 had never met AGOPIAN and did not know who he was. Thereafter, AGOPIAN began to send VICTIM 1 unsolicited roses, cassette tapes with recorded love songs, poetry, letters, and condoms to her residence. VICTIM 1 never dated, met, or had any personal contact whatsoever with AGOPIAN. VICTIM 1 did not know how AGOPIAN was able to obtain her telephone number or her residence address. After many unsolicited calls and deliveries, VICTIM 1 asked AGOPIAN to stop all communication with her because VICTIM 1 felt very uncomfortable.

12. VICTIM 1 moved to Los Angeles, CA to her parent's home during the summer of 1991. One day, roses with dog feces were delivered to her at her parents' home from an anonymous sender. On another occasion, an anonymous package arrived at her parents' home, containing several batteries, wires, and other items which appeared to resemble a bomb. VICTIM 1's parents

immediately called the police and a bomb squad came out and evacuated the area. Also inside the package was a joker playing card with the words "You Lose" written on it. VICTIM 1 believed that AGOPIAN was responsible for the harassment. VICTIM 1 and her parents contacted the Dean of Students at UCSB and reported AGOPIAN's continued and ongoing harassment. At the University's recommendation, VICTIM 1 obtained the Restraining Order against AGOPIAN, which was subsequently granted and renewed on two occasions, each being about three years in duration.

13. VICTIM 1 returned to UCSB for the start of the next school year. While at UCSB, VICTIM 1 would often find her vehicle tires intentionally deflated, which she attributed to AGOPIAN. On one occasion VICTIM 1 was in a UCSB bookstore and a man she later learned was AGOPIAN was there. AGOPIAN approached VICTIM 1 and pushed VICTIM 1 into a shelf of books, toppling the shelves causing VICTIM 1 to fall the ground. The police were called and AGOPIAN was arrested.

14. VICTIM 1 told law enforcement that AGOPIAN went to law school but did not pass the moral character portion of the process. When AGOPIAN learned he did not pass the moral character application because of the harassment and the Restraining Order granted to VICTIM 1, AGOPIAN sued VICTIM 1 for defamation. VICTIM 1 was represented in the defamation lawsuit by VICTIM 2, whom VICTIM 1 dated and later married. VICTIM 1 and VICTIM 2 are now divorced.

15. Since then, and continuing for many years, VICTIM 1 and her family had received very vulgar, lewd, and obscene

letters. VICTIM 1 told law enforcement that she believed that AGOPIAN sent those letters because the content and style of the letters were similar to the letters AGOPIAN sent to VICTIM 1 in the past. Vulgar letters, either unsigned or using false names, were also sent to many of VICTIM 1's parents' neighbors stating VICTIM 1's parents were pedophiles and sex offenders. VICTIM 1's second husband also received harassing letters after his marriage to VICTIM 1.

16. Approximately five or six years ago, VICTIM 1's law firm employer received very vulgar and defamatory anonymous letters and emails about VICTIM 1. VICTIM 1's boss approached VICTIM 1 and said they did not believe the letters and agreed to hire a private investigator to find the source of the letters and emails. VICTIM 1's boss even responded to the email saying they supported VICTIM 1. After this, many other outside lawyers within the same legal specialty received anonymous letters and emails about VICTIM 1, saying VICTIM 1 was being fired by her law firm and advising not to do business with her. VICTIM 1 told law enforcement that she suspected that AGOPIAN was responsible for these letters and emails. The private investigators could not find the source of the anonymized emails but did learn that AGOPIAN lived in Ventura County.

17. During an interview with law enforcement, VICTIM 1 was shown a photograph which she immediately recognized as AGOPIAN. VICTIM 1 never had a personal or professional relationship with AGOPIAN. The only time VICTIM 1 ever saw AGOPIAN face to face

6

was in the UCSB bookstore and in court when the Restraining Order was granted.

**B.     Email to VICTIM 3**

18.    VICTIM 3 is the daughter of VICTIM 1 and VICTIM 2.  On April 6, 2020, at 10:54 p.m., an anonymous email was sent to VICTIM 3 at VICTIM 3's university email address.  The message in its entirety is below.

> From: Anonymousemail <noreply@anonymousemail.me>
> Date: Mon, Apr 6, 2020 at 10:54 PM
> Subject: [VICTIM 3]
> To: <[VICTIM 3]@ucsc.edu>
>
> This message was sent via anonymousemail
> To remove this signature and unlock all features go premium
>
> Hi there. I enjoyed watching you play at Whittier, Cal Tech, and Cal Lutheran.  Too bad I won't be able to watch you play again for a while.  You have a pretty smile.  UC Santa Cruz is such a lovely campus.  I just want you to know if I rape and kill you, it will be because your father is a thief and an evil traitor who associates with dangerous people and keeps secrets from you and your mother.

19.    VICTIM 3 is a student athlete at UC Santa Cruz, who travels to other colleges and universities to play her sport,

7

including the locations identified in the email above.  VICTIM 3 confirmed that the team's game schedule is posted publicly on the internet.

20.   On August 3, 2020 online research for 'anonymousemail.me' resulted in the ".me" designation denoting a Montenegro-based company. Contact information for 'anonymousemail.me' resulted in the following email address: anonymousemail.me@protonmail.com.  An online search for information on Protonmail revealed Protonmail is a secured email incorporated in Switzerland and all servers are located in Switzerland.  Per the Protonmail official website, www.protonmail.com, Protonmail uses "end-to-end encryption and zero access encryption to secure emails.  This means even we cannot decrypt and read your emails.  As a result, your encrypted emails cannot be shared with third parties."  "No personal information is required to secure your secure email account.  By defaults, we do not keep any IP logs which can be linked to your anonymous email account."

21.   Agents are continuing to investigate whether IP Information can be obtained from Protonmail.

   **C.   Letters Sent to VICTIM 3**

22.   Following her receipt of the April 6, 2020 email, VICTIM 3 received two letters postmarked on April 7, 2020.  One of the letters was addressed to VICTIM 3 at her residence in Los Angeles and the other letter was addressed to VICTIM 3 at her father's (VICTIM 2) place of employment in Los Angeles.

23. Both letters bear a legible postmark from Santa Barbara, California and both letters appear to have been typed in normal case, black colored font.

24. In both letters, the message was identical with no signature line. The content of the message is below.

> Hi there. I enjoyed watching you play at Whittier, Cal Tech, and Cal Lutheran. Too bad I won't be able to watch you play again for a while. You have a pretty smile. UC Santa Cruz is such a lovely campus. I just want you to know if I rape and kill you, it will be because your father is a thief and an evil traitor who associates with dangerous people and keeps secrets from you and your mother.

**D. The Threatening Letters Were Posted by Mail**

25. On July 30, 2020, SA Ryan and I spoke with Postal Inspector Mark Trachtenberg, of the United States Postal Inspection Service, who said the following, in substance and in part:

    a. A postmark is a positive indicator that something was sent via the USPS. The postmark is generated at the first processing and distribution center that the item goes to after being picked up by a mail carrier. The postmark identifies the processing center that processed the letter.

    b. At the processing center, a number of codes are added to the envelope. A florescent barcode is printed on the back of the letter and a machine takes an image of the front of the envelope that allows the system to Optical Character Recognition the address the letter is being mailed to. The barcode on the front of the envelope is then printed. This barcode identifies the address the letter was mailed to and

9

provides an identification number that corresponds to the date and time the letter was processed. The barcode information can be identified indefinitely.

26. I know from speaking with SA Ryan that the two envelopes that contained the threatening letters bear both a postmark and the barcodes described by Postal Inspector Trachtenberg as being hallmarks of an envelope having gone through the USPS mail stream.

    E.    **Identification of AGOPIAN**

27. Both of the letters received by VICTIM 3 were sent to the Los Angeles Police Department Technical Investigation Division ("The Lab") for fingerprint and DNA analysis. The letter that was postmarked on April 7, 2020, and was sent to VICTIM 3 at her Los Angeles residence contained a fingerprint on the front side of the letter. The Lab conducted a fingerprint comparison between AGOPIAN's fingerprints saved in the Automated Fingerprint Identification System ("AFIS") as a result of the Restraining Order proceedings, and the fingerprint on the front side of the April 7, 2020 letter sent to VICTIM 3's Los Angeles residence. The fingerprint on the letter matched AGOPIAN's fingerprint in the AFIS.

    F.    **Interview of VICTIM 3**

28. VICTIM 3 was interviewed on July 29, 2020, by SA Ryan and Los Angeles Police Department Detective Mark Seston. During the interview, VICTIM 3 stated that when VICTIM 3 initially received the threatening email at VICTIM 3's university email address, VICTIM 3 felt "very scared" and "very violated."

VICTIM 3 did not sleep well that night and became worried for her safety and the safety of her family. VICTIM 3 continued to tell SA Ryan and Detective Seston that when she received the two threatening letters, VICTIM 3's fear and concern was reignited. Furthermore, the letters were addressed to VICTIM 3's residence, which made VICTIM 3 even more frightened that the sender knew where VICTIM 3 lived.

### G. Identification of the SUBJECT PREMISES and the SUBJECT VEHICLES

29. On July 9, 2020, the FBI conducted a California Department of Motor Vehicle ("DMV") query on AGOPIAN. The DMV database search for AGOPIAN's residence returned to a residential address of 120 East C Street, Unit A, Port Hueneme, California (the "SUBJECT PREMISES"), which is located in Ventura County.

30. The DMV query also returned vehicles registered to AGOPIAN. One of the vehicles was a Ford Taurus bearing the California license plate 4EYW207 ("SUBJECT VEHICLE 1"). This vehicle was registered to the SUBJECT PREMISES.

31. On July 24, 2020, in the afternoon, SA Ryan conducted surveillance of the SUBJECT PREMISES. SA Ryan clearly identified the SUBJECT PREMISES as there was a porch light and a label "A" to the left of the main entrance. SA Ryan also noticed that SUBJECT VEHICLE 1 was parked in a carport near the residence.

32. During the surveillance, an individual matching AGOPIAN's description came from the vicinity of the SUBJECT

PREMISES and peered into SUBJECT VEHICLE 1. The individual then proceeded towards a gray Honda CR-V sport utility vehicle bearing the California license plate 8FHV040 ("SUBJECT VEHICLE 2"). The individual opened the door and entered VEHICLE 2, proceeded to back out of the driveway, and then drove away. Surveillance was subsequently terminated.

33. Later that same day, SA Ryan conducted a California DMV query on SUBJECT VEHICLE 2. The query returned the vehicle as being registered to Alenoush Agopian. The associated address with the registration matched to the SUBJECT PREMISES.

**V.    TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES**

34. Based on my training and experience and information obtained from other law enforcement officers who investigate crimes involving stalking, making threats by interstate communications, and mailing threatening communications, I know the following:

35. People who commit or attempt to commit the Subject Offenses often perform research on the individuals they are stalking and threatening. These individuals usually look for addresses, biographical information, family information, and other personal identifying information on their targets. These individuals also keep photographs and other media depicting their targets, and they often write about them in handwritten or digital journals or diaries. These individuals often retain these items of value in order to continue stalking their targets and to continue sending threatening communications by mail.

36. It is common practice for people who commit or attempt to commit the Subject Offenses to possess and use multiple digital devices at once. Such digital devices are often used to research and continue to threaten the stalker's targets. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by stalking and harassing a target electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) researching personal information about the stalker's targets; (2) following the targets via social media; (3) maintaining photographs of the targets; (4) keeping records of their crimes; and (5) contacting their victims directly or indirectly by phone.

37. Oftentimes, people who commit or attempt to commit the Subject Offenses take pictures with their cellphones of mementos that remind them of their targets. They also often use pseudonyms to mask their true identity.

38. It is also common for people who commit or attempt to commit the Subject Offenses to keep notes and/or "profiles" of victims on digital devices, and in their homes and cars. Such "profiles" contain the personal identifying information of victims, such as names, addresses, school information, Social Security numbers, dates of birth, and driver's license or state identification numbers.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

39. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

 a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

 b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    40. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

41.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress AGOPIAN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of AGOPIAN's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

42. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. REQUEST FOR SEALING

43. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the

17

investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## VIII. CONCLUSION

44. For all the reasons described above, there is probable cause to believe that AGOPIAN violated Title 18, United States Code, Section 875(c) (Threats by Interstate Communications).

45. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at or in the locations, as described in Attachments A-1, A-2, and A-3.

/S/
Robert C. McElroy
Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this __4__ day of August, 2020.

HONORABLE
UNITED STATES MAGISTRATE JUDGE